The PENNSYLVANIA RAILROAD
COMPANY, Plaintiff,

v.

ALLEN N. SPOONER & SON, Inc.,
Defendant.

Civ. A. No. 11429.

United States District Court,
E. D. New York.

Feb. 3, 1955.

Irving H. Schafer, New York City, for The Pennsylvania Railroad.

Galli & Locker, New York City, for Allen N. Spooner & Son, Inc., by Patrick J. McCann, New York City, of counsel.

RAYFIEL, Judge.

Harvey Miller commenced an action against Pennsylvania Railroad Company, hereinafter called "Penn", to recover damages for personal injuries sustained by him as a result of "Penn's" negligence. The latter then caused a third-party complaint to be served upon plaintiff's employer, Allen N. Spooner & Son, Inc., hereinafter called "Spooner", claiming the right to indemnification by the

latter if the plaintiff should recover a judgment against it.

During the course of the trial Miller's claim against "Penn" was settled by payment of the sum of $70,082.88. Counsel for "Spooner" attended the negotiations leading toward the settlement, and agreed to make no claim that the same was improper or improvident. The third-party action was then severed, and the attorneys for the parties stipulated that the issues therein presented be tried before this Court without a jury. It was further stipulated that the evidence introduced at the trial of Miller's action against "Penn" would be deemed a part of the record in the third-party action, so far as the same might be applicable thereto.

These are the facts: "Penn" owns, controls, maintains, and operates a building located on the east side of First Avenue, between 33rd and 34th Streets, in the Borough of Manhattan, New York City, which is known as shaft-house No. 4. It houses certain electrical equipment, including fans which are used to ventilate the tunnels through which the trains running between Long Island City and "Penn's" terminal in New York City are operated.

Also included in the equipment was a concrete cowl, also referred to as a vent or duct, which ran through the north wall of the shaft-house. It had become defective, and "Penn" hired "Spooner" to remove it, and to replace it with one of steel, which was to be constructed by "Spooner" according to plans and specifications furnished by "Penn". The construction and installation were to be done under the terms and conditions of an agreement between "Penn" and "Spooner", bearing date the 8th day of May, 1942, and hereinafter referred to as the General Contract.

On or about October 7, 1950, the steel cowl was delivered at the shaft-house for installation. After examination and measurement it was determined that it could not be installed in one piece, and accordingly it was cut in two for installation in sections. The work proceeded on October 7th in the presence, among others, of a Mr. Tomlinson and a Mr. Walker, respectively an inspector and a master carpenter in the employ of "Penn", and George Spooner, an officer of "Spooner".

The work could not be completed on that day, and on Saturday, October 14th, a group of "Spooner's" employees returned to continue their work. Since, as hereinbefore stated, the cowl could not be installed in one piece, it became necessary to weld the two sections together. That task was assigned to Miller and one Sharkey, both in the employ of "Spooner" as welders.

The welding operation, with which we are here chiefly concerned, could not be completed on October 14th, and the "Spooner" employees, including Miller and Sharkey, returned on the following day, Sunday, October 15th, to complete it. During the afternoon of that day Miller and Sharkey, taking turns, were engaged in welding the lip of the cowl to the lip of the housing containing the ventilating fan.

Shortly after 9:00 P.M. on October 15th, while Sharkey was welding, and Miller was standing on a platform about eighteen inches from him, there was a bright flash and a terrific explosion, following which the shaft-house became filled with dust and smoke. Miller was thrown down and suffered injuries which were the basis of his action against "Penn". His clothes were smoldering or smoking, and part of his clothing had been torn from his body.

The high-tension wires in the shaft-house were de-energized on October 7th, when the cowl was delivered and the work thereon begun. This was done at the direction or request of Mr. Walker, of "Penn". However, they were not de-energized on October 14th, or on October 15th, the day of the accident.

"Penn" rests its claim against "Spooner" on three main points: (1) that "Spooner" was under an implied obligation to perform its work under the General Contract in a reasonably safe and proper manner; that it failed to do so

for the reasons hereinafter in this paragraph stated, and that by reason thereof "Penn" is entitled to be indemnified by "Spooner" to the extent of the payment made to Miller under the aforementioned settlement.

(2) that "Spooner" failed to inform "Penn" of the fact that its men would be working in the shaft-house on Sunday, October 15th, and by reason thereof the high-tension wires were not de-energized, thus exposing "Penn" to liability to the plaintiff for failing to provide him with a safe place to work; that "Spooner's" failure to so inform "Penn", and its direction to Miller to do his work under the existing conditions, constituted active, primary or even sole negligence, and that "Penn's" negligence, if any, was passive; (3) that "Spooner's" acts and failures to act, as aforesaid, were violative of a provision in the General Contract, under which "Spooner" agreed "to take, use, provide and make all proper, necessary and sufficient precautions against accidents, injuries or damages to any person or property * * *."

In support of the first of these points "Penn" cites the case of Valerio v. American President Lines, D.C., 112 F. Supp. 202, 204, wherein Judge Bondy, quoting from the case of Barber SS Lines v. Quinn Bros., D.C., 104 F.Supp. 78, said: "'* * * where a person has a non-delegable duty with respect to the condition of his premises or vessel but has made a contract with another to perform that duty, and the other performs it negligently so as to make the owner liable to a person later injured, then, as a matter of implied contract, the owner is entitled to restitution from the other for reasonable damages paid the injured person.'"

The principle stated in the Valerio case, supra, is well established, but the facts there are clearly distinguishable from those in the instant case. "Spooner", while required to use reasonable precautions to avoid injury or damage to person or property, was under no obligation, express or implied, to assume, or to relieve "Penn" of its duty to provide the plaintiff with a safe place to work. "Spooner" did not create or suffer the unsafe conditions which resulted in plaintiff's injuries; nor did it have any control over the electric equipment and power involved therein. The other cases cited by "Penn" in support of that point are likewise distinguishable.

"Penn's" second point, to wit, that "Spooner" failed to inform it of the fact that the welding operation would be continued on Sunday, October 15th, and its consequent failure to de-energize the high-tension wires on that day, was not supported by the evidence in the case. Following is some of the testimony which justifies such a conclusion. For instance, Spooner testified that he had had a conversation with Mr. Perry, of "Penn", during the week of October 2nd. During his testimony he was asked (P. 281, S.M. 1st trial):

"Q. Will you give this court and jury in substance the conversation that you had with Mr. Perry during the week where Saturday was October 7th; tell in substance that conversation. A. Well, a resume of it, it was roughly that I told him that we were going to bring this cowl up on Saturday (October 7th) and place it. He agreed with me on that and said it should be done on the week-end because of the lighter traffic on the railroad at that time. He also said it should be done the following weekend and completed, if possible." (matter in parenthesis added.) Perry, of "Penn", testified, on cross-examination, (S.M. 2nd trial, P. 37) "Q. * * * isn't it a fact that through these tunnels which this duct house protected, that traffic was lighter on Saturdays and Sundays than it was during the rest of the week? A. Generally speaking that is correct.

"Q. Now, isn't it a fact that you as a railroad man wanted this work done during the light traffic period, that is over Saturday and Sundays? A. That would be correct." And later in his cross-examination, (see pages 44 and 45 S.M. 2nd trial) Perry admitted that in the course of a conversation he had with

Spooner during the week of October 2nd (1950) he told Spooner that the cowl should be brought in "on the weekend because of the lighter traffic on the railroad at that time." Perry also said that it should be done the following weekend and completed, if possible.

I believe that "Penn" knew that "Spooner's" men would be working on Sunday, October 15th. However, even if it had no actual knowledge of that fact, it had reason to believe that they would, and under such circumstances "Penn" would be guilty of negligence. In the case of Pike v. Consolidated Edison Company the plaintiff sued to recover damages for the death of an employee of a construction company, who was electrocuted while unloading steel from a truck when the cable attached to the crane used in the operation came in contact with high-tension wires maintained by the defendant. The latter had been informed that a building was to be constructed at the scene, but claimed that it had no actual notice as to when the crane would be in operation. The plaintiff recovered a judgment, which was reversed by the Appellate Division, 277 App.Div. 1020, 100 N.Y.S.2d 892, which dismissed the complaint. The Court of Appeals, reversed, 303 N.Y. 1, 99 N.E.2d 885, 886 saying " * * * the defendant Consolidated Edison Company had full, exact and early information of the nature of the building operation that was being carried on at 950 Georgia Avenue and thus that company had been warned of the probability that workmen erecting the overhead structure there would perchance be exposed to the undisclosed deadly peril which caused the death of the intestate. *In these circumstances, the defendant Consolidated Edison Company was bound to* ascertain the time when the work of building the overhead structure at 950 Georgia Avenue was to begin, in order to enable itself to protect workmen against the danger that was there hidden in its high tension wires * * *." (Emphasis added.) "Penn" also cited that case, contending that its failure to perform its duty to Miller constituted passive negligence only. I disagree.

There is still another reason why "Penn" should be charged with knowledge that "Spooner's" men might be or actually were working in the shaft-house on Sunday, October 15th. Miller testified that while he was engaged in the welding operation two men in working clothes were in or about the shaft-house. There was testimony to the effect that they were not employees of "Spooner", and it was not denied that they were employees of "Penn". They had access to the building and equipment, and to the tunnels underneath the shaft-house, and one of them from time to time warned Miller and Sharkey of the approach of trains, instructing them to leave the room containing the opening leading to the tunnels. They would then close the door to prevent the entry of backdrafts from passing trains. While there was no testimony to the effect that they were "Penn" employees the circumstances indicate that they were.

But Miller's action against "Penn" was not grounded solely on the latter's failure to have the wires de-energized during the course of the installation of the cowl. His chief claim was that "Penn" had failed to provide him with a safe place to work, and that the place was rendered unsafe by "Penn's" negligence in permitting dust, dirt and metal particles to accumulate on the insulators and equipment to such an extent as to make possible the arcing or short-circuiting of the electric current, of all of which Miller had no knowledge; further that the resultant dangerous condition could have been prevented if "Penn" had exercised reasonable and proper precautions.

Fred A. Wahlers, an electrical engineer, testifying in behalf of the plaintiff stated that it was his opinion that the explosion, which occurred in the shaft-house on October 15th, 1950, was the result of a "flashover of the insulator, which, in electrical terms, means a short

circuit, and that results in an ensuing arc or long flame, which may be many feet." (S.M.P. 508, 1st trial.)

Francis J. Love, a battalion chief in the New York City Fire Department, testified that at 9:08 P.M. on the day of the accident, and within a very few minutes after it occurred, he arrived at the shaft-house in response to an alarm received by him at 9:06 P.M. He stated that he made an inspection of the equipment, including the fans and insulators. He found an accumulation of dust on the insulators, and also a gray cast resulting, he stated, from a flash-over from a short circuit. He stated, further, that the cause of the fire was a short circuit in the high tension cable. (S.M.P. 169, 1st trial.)

Siewert, construction superintendent for "Spooner", who was in the shaft-house when Miller was injured, testified (P. 87 S.M., 1st trial) that he examined the welding equipment, including the handle, shortly after the accident, and found no evidence of burns or other damage.

Morton Arendt, an electrical engineer, testifying in behalf of "Penn", stated that it was his opinion that the accumulation of dust on the insulators was not a competent producing cause of the flash-over and the injuries sustained by Miller. He was asked whether it would have been good practice to use flashover boards, (a device designed to prevent an arc from crossing from one insulator to another) and he answered "Flash-over boards are desirable but not essential." In reply to a question as to whether they prevent arcing he stated that they did. "Penn" had none in the shaft-house.

Charles A. Hanna, employed by "Penn" as assistant supervisor of telegraph and signals since 1944, and who had charge of the maintenance and repair of facilities connected with the electric tracks department, testified that there was dust in the shaft-house which had been carried in by backdrafts from the tunnel; that he had not had the insulators cleaned since 1944; and that where there is "too much contamination, too much dirt" you may get an arc. (See S.M.P. 166, 2nd trial.) He testified further that flash-over boards are used by "Penn" in its A.C., but not in its D.C. substations. In my opinion the evidence in the case supports the theory that the explosion and fire which resulted in the injuries to Miller were caused by a short circuit resulting from the accumulation of dirt and dust on the insulators.

As to "Penn's" third point, i.e., that "Spooner's" acts and failures to act were violative of a provision in the General Contract requiring it to provide and take all necessary and sufficient precautions against accidents to persons and property, the testimony is clear and convincing that "Spooner's" representatives, prior to the commencement of the welding inside the building, warned its employees to be careful of the high tension electrical equipment. Martin Siewert, "Spooner's" construction superintendent, testified to that effect, and Miller himself testified that he had been warned of the danger and that he was at all times careful not to come in contact with any of the electrical equipment.

Mr. Siewert testified (P. 69 et seq. S.M. 1st trial) as follows:

"Q. Was Harvey Miller present when you had that talk? A. Yes, the two welders, I spoke to the two welders.

"Q. Did you talk to them about any possible danger in going into that area to do the work? * * *

"Q. Did you? A. Yes, I mentioned it to them.

"Q. What did you mention? A. That in the air above them we had high voltage wires.

"Q. What did you say to them, the substance; what did you say? A. The substance was it was high voltage wires in there and we had to be very careful and know we couldn't go on that platform.

"Q. When you say 'we couldn't go on that platform'—for one thing, did you say anything to Harvey and the other boys about not going on the platform? A. Oh, yes, definitely told them not to."

And again, at page 139 et seq., S.M. 1st trial:

"Q. Well, now, when you saw the sign 'Danger, keep off,' you had a talk with Mr. Miller and Mr. Sharkey, the welders, didn't you? A. Yes.

"Q. Now, you told them didn't you, that it was dangerous up there, didn't you? A. Not in those words. I told them to keep off that platform—".

The record reveals that Miller testified on several occasions that he was warned of the danger by "Spooner's" representatives. At page 340, et seq. of the minutes of the first trial he testified as follows:

"Q. Well, how did you know if it (the current) was on or off? A. I was told to stay away from the current.

"Q. Who told you that? A. My foreman, Cosmo Gentilcore.

"Q. When you worked there Saturday were you told to stay away from the current? A. Yes, sir.

"Q. Did you stay away—* * * A. Yes, sir.

"Q. And the following day, Sunday, October 15th, was it Gentilcore who again spoke to you about staying away from the current? A. Yes sir." (Matter in parenthesis added).

Again, at page 438, he testified that he knew that there was high tension electrical equipment there.

"Q. Did you know before you went up there, that there were high tension electrical equipment up there? A. Yes, sir.

"Q. Had you been told that that high tension electrical equipment carried approximately 11,000 volts? A. I was told it was high tension equipment, but how much volts I didn't know."

At page 448 he testified that he was extremely careful because he knew that there were live wires there.

"Q. You were always extremely careful? A. Yes, sir.

"Q. Why were you extremely careful? A. Because I knew there was live wires up there, or cables."

Throughout his testimony Miller denied that any part of his body came in contact with the electrical equipment (Page 453, et seq. S.M. 1st trial).

"Q. And is it your testimony that your body did not come in contact with anything at that time? A. No, sir.

"Q. You did not lean up against something, like I am leaning up against here, for instance (demonstrating). A. No, sir.

"Q. You did not lean over against that rail—there was a rail there, wasn't there? A. Yes, sir, there was a rail but not at that place.

"Q. You are sure that you were not looking toward the north wall? A. No, sir.

"Q. And you are sure this right ear of yours did not come in contact with the skirt insulator as shown on Defendant's Exhibit S (handing)? No, sir.

"Q. And it did not come near that skirt insulator shown on Defendant's Exhibit S? A. No, sir. Maybe I can add to that—both of my ears were burned.

"Q. Yes, I know that, but it was your right ear that was burned worse, wasn't it? A. I could not say that either because it was treated in the hospital.

"Q. At any rate did you come anywhere near any of those skirt insulators? A. No, sir.

"Q. And you did not pass any skirt insulator, such as is shown in Defendant's Exhibit D, with your head in close proximity to the skirt insulator? A. No, sir.

"Q. You are sure about that? A. I am sure.

"Q. Do you recognize those skirt insulators shown there on Defendant's Exhibit D? A. Yes, sir.

"Q. How far away were you from those skirt insulators? A. That I don't know. I know enough to stay away from an insulator."

In my opinion "Spooner" took every precaution required of it under the contract to prevent accidents. It warned its employees of the danger incident to

working near the high tension electrical equipment and its employees exercised care and prudence while engaged in that work.

I am convinced that no part of Miller's body touched the electrical equipment. "Penn" intimated that Miller's right ear came in contact with the skirt insulator. I disagree. Both of Miller's ears were burned and I cannot see how it was physically possible for both his ears to come in contact with the insulator.

But even if "Penn" had established that the injuries to Miller resulted solely from "Spooner's" negligence, or that "Penn's" negligence was merely passive, while that of "Spooner" was active,—and I find that it failed to do so— "Penn" would not be entitled to a recovery. Subdivision XVI (b) of the General Contract provides that before the commencement of any work thereunder "Penn" will procure and maintain during the period of the work, for the account of the Contractor, (Spooner) but at the expense of the Railroad, (Penn) insurance covering any liability of the Contractor or any sub-contractor, and the Railroad, for personal injury to or death of any person on account of accident, casualty or happening * * * in an amount not exceeding One Hundred Thousand Dollars ($100,000.00) for any one person * * *" (matter in parenthesis added). Workmen's compensation insurance was to be furnished by "Spooner".

In the case of Gorham v. Arons, 282 App.Div. 147, 121 N.Y.S.2d 669, 672, a similar situation, so far as insurance coverage is concerned, obtained. In that case the lessor of a motor truck had obtained a judgment against the lessee thereof in a third-party action to recover damages which it had been obliged to pay the helper on the truck, an employee of the lessee, because of the negligence of the driver thereof, likewise an employee of the lessee.

The Appellate Division reversed the judgment and dismissed the third-party complaint, holding that the lessor's obligation to provide indemnity insurance (similar to that in the instant case) protecting the parties against liability for damage for personal injury meant that the lessee was to face no liability which might arise from the operation of the truck. The Court said further: "It is, of course, immaterial that, as claimed by lessor, in this particular case workmen's compensation insurance is carried by lessee, * * *."

For the foregoing reasons judgment is rendered in favor of the third-party defendant, dismissing the third-party complaint.

Submit proposed findings of fact, conclusions of law and decree in conformity herewith.